***********
Having reviewed the competent evidence of record the Full Commission modifies the Chief Deputy Commissioner's Opinion and Award.
 ***********
Several objections were raised during the evidentiary hearing before the Chief Deputy Commissioner, including objections to the effect that plaintiff's testimony was based on hearsay or otherwise was not supported by the testimony of Gregory H. Tuttle, M.D., and/or plaintiff's medical records which were admitted in evidence. To the extent that the particular testimony constitutes uncorroborated hearsay or otherwise is not supported in the record, the Full Commission sustains the defendants' objections. The Commission has determined whether the proposed evidence is admissible, and has considered the admissible evidence as expressed in this Opinion, in accordance with the applicable rules of evidence.
 ***********
The Full Commission finds as fact and concludes as a matter of law, the following, which were entered unto by the parties at the evidentiary hearing as
 STIPULATIONS
1. All parties are correctly designated and there is no question as to misjoinder or nonjoinder of the parties.
2. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and the subject matter.
3. Pursuant to a March 20, 2000 Order by Commissioner Bernadine S. Ballance, all of the allegations in plaintiff's complaint are deemed admitted and therefore, the following facts are established as a matter of law:
 a. Plaintiff was injured on July 7, 1996, at the Student Recreation Center in Chapel Hill which was operated by the University of North Carolina;
 b. Laurin Mangili was the manager of the Student Recreation Center and at all times pertinent hereto was an agent of the University of North Carolina and was acting within the scope of her agency;
 c. Plaintiff was injured when a negligently maintained cable came loose on a "Cybex Lat-Pull" machine which caused the heavily loaded weight bar to crash down upon plaintiff's head and neck with great force and velocity and which proximately caused the plaintiff to suffer severe and permanent injuries.
 4. Pursuant to Section 7A(d) and (k) of H.B. 1840 and N.C.G.S. § 143-299.2, as rewritten, the monetary cap applicable to this action is $500,000.
***********
Based on the admissible and competent evidence of record, the Full Commission makes the following
 FINDINGS OF FACT
1. Plaintiff is a graduate of University of North Carolina at Chapel Hill (UNC) who at the time of the evidentiary hearing was in his third year of medical school at the University of North Carolina. Plaintiff was born on May 2, 1976, and thereby currently is 25 years of age.
2. This action concerns an injury that occurred on July 7, 1996, when plaintiff was an undergraduate student and was 20 years of age. Plaintiff contends that, while he was using the Cybex machine, the cable that connects the bar to the weights came loose causing him to pull the bar into his head. Although the accident and negligence have been stipulated by the parties pursuant to a discovery abuse Order entered by Commissioner Ballance, plaintiff testified, and plaintiff's medical records also reflect, that the cable came loose causing plaintiff to pull the bar to his head which resulted in a small cut on his head and possible brief loss of consciousness. Plaintiff's testimony and his medical records corroborate and support the finding that his injury resulted from a Cybex machine which was negligently maintained in such a manner that plaintiff sustained an injury while using the machine in an anticipated manner.
3. At the time of his injury plaintiff was a member of the UNC wrestling team. Plaintiff participated in wrestling since he was five years old. In high school plaintiff was ranked first or second in the State of New Jersey. A typical day for plaintiff in high school was that he would train for wrestling 3 to 4 hours per day after school and 1 to 2 hours per day before school, and lifted weights in the evenings. In his senior year, plaintiff dislocated his elbow and was forced to miss the State tournament. Plaintiff was academically first in his class of 420 in high school.
4. Plaintiff moved to North Carolina in August 1994 to attend UNC as a pre-med (biology) major. In high school, plaintiff had a desire to become a plastic or orthopedic surgeon. Plaintiff has an uncle who is an orthopedic surgeon and plaintiff enjoyed his stories and aspired to be like him. In evidence is a newspaper article wherein plaintiff expressed this desire while he was in high school. Although plaintiff entered the UNC with this aspiration, he testified that his mind was open and that he was not closed to consider other fields of medicine.
5. When plaintiff entered UNC he did not intend to wrestle in college. Plaintiff, however, had been required to withdraw from the State tournament in his senior year of high school, thus creating an unrequited desire to prove his ability. Accordingly, he approached the UNC wrestling team as a walk-on member. Plaintiff made the UNC wrestling team. As a member of the wrestling team, plaintiff was involved in the typical traumatic events of this physical sport, which included physical contact in practice and competition, and participation in a weight lifting program. While wrestling plaintiff received several injuries including a concussion in November 1995. In April 1996, plaintiff sought medical attention for parascapular pain and pain with movement of his left arm and neck which was considered to be from a muscle strain.
6. On July 7, 1996, plaintiff was using the Cybex machine as a part of his off-season training program.
7. The day after the injury, plaintiff reported the event to the physical therapy department of the student health service and indicated that he had a "slight headache along area of head where the bar hit him" and that he was able to complete his workout on the date of injury and was able to coach a half-day session of a wresting camp the following day with "no other reported problems." (Tr. Ex. p. 66)
8. Plaintiff reported to the sports medicine department at the UNC student health service on July 23, 1996, with complaints of a headache. The chart note for this visit reports a past history of two prior concussions with medical treatment in November 1995. Plaintiff indicated that his headaches had improved until July 22, 1996, when they became worse with weight lifting. Plaintiff reported mild tinnitus without nausea, vomiting or dizziness. The headaches were frontal and causing difficulty with concentration and reading. Plaintiff was diagnosed with post-concussive syndrome and advised to cease participation in physical activities. A MRI was ordered and plaintiff was requested to return in one week.
9. A MRI of the brain was performed on July 27, 1996, and was reported by the radiologist to be "within normal limits."
10. Plaintiff returned to the UNC student health service on July 30, 1996, at which time he reported that his condition had improved and that his headaches, concentration problems, and nausea were decreased. Plaintiff's MRI was within normal limits. Plaintiff was advised to continue with the present plan of no physical activities and to follow up in one week. From the medical records submitted, it is not clear whether plaintiff kept this appointment; the next records are for contact in September and October 1996 when plaintiff is seeking his physical examination and medical clearance for the wrestling team.
11. On October 22, 1996, plaintiff saw Dr. Tuttle. The October 22, 1996, chart note indicates that plaintiff was not happy with his MCAT (medical school admission examination) scores. Plaintiff had a total score of 29; 28 was the average for entering UNC medical school. At this visit, plaintiff indicated that he had headaches that would last 1 to 2 hours and then be gone and that the headaches began with activity generally when he was at 60 to 70% effort. No other neurological problem was found or reported. Dr. Tuttle discussed with plaintiff the concept of "second impact syndrome" and plaintiff agreed to hold off all activity for 2 to 4 weeks and to avoid activity that caused symptoms during this period. Plaintiff contends that he took a medical red shirt (a leave of absence) from the wresting team because of this condition.
12. Plaintiff returned to Dr. Tuttle on November 4, 1996. Plaintiff reported that he was "much better." Plaintiff indicated that he had headaches that would last 20 minutes. The headaches were behind his eyes with a pressure sensation to the base of his neck and with a "throbbing" quality. Physical examination of the neck revealed moderate tenderness at C5-C7 with pain upon extension with left lateral bend and increased lateral load which caused occipital headaches to occur. Dr. Tuttle added the diagnosis of potential cervical injury in addition to the prior diagnosis of post-concussive syndrome.
13. On November 4, 1996, plaintiff was also seen in the UNC student orthopaedic clinic by L. Almekinders, M.D. At this examination plaintiff denied any radicular symptoms in his upper extremity. Physical examination revealed a preserved range of motion in his neck and normal extremity strength and sensation. Dr. Almekinders noted that x-rays revealed a slight subluxation of C5 on C6; however, did not believe that any intervention was warranted.
14. The radiology report for C-Spine study performed on November 4, 1996, reveals a normal alignment with preserved disc space height with some limitation of extension and flexion.
15. On November 19, 1996, plaintiff saw Richard M. Toselli, M.D., with the department of neurosurgery at the request of Dr. Tuttle. Dr. Toselli's records reveal that plaintiff had symptoms suggestive for occipital neuralgia. Plaintiff's neurological examination was intact (normal). A MRI of the head was normal, but his cervical spine revealed that plaintiff had a small amount of anterolisthesis (slippage) of C4 on C5 which did not move with flexion/extension. Dr. Toselli did not believe that this condition warranted further consideration and that it would not preclude plaintiff from wrestling. Dr. Toselli recommended physical therapy for occipital neuralgia and a cervical MRI to be on the safe side, although he did not anticipate any significant pathology.
16. Also on November 19, 1996, plaintiff saw Alan G. Finkel, M.D., a neurologist, at the UNC headache clinic. Plaintiff described his headaches and complained that he had no headache-free days. Plaintiff indicated to Dr. Finkel that he was in a normal state of health until the episode of striking his head when the cable came loose on the Cybex machine. A review of past history revealed that plaintiff dislocated his elbow while wrestling in high school and that he sustained a concussion caused by a significant impact while wrestling, causing dizziness and mild confusion. Dr. Finkel reviewed radiology studies which revealed a normal MRI scan of the brain and some osteophytic changes at C4/C5 with flexion/extension. Plaintiff's physical examination was normal. Dr. Finkel reported that plaintiff's headaches were improving and that with continued rest they may improve slowly. Indocin was prescribed for headaches. Dr. Finkel did not believe that plaintiff was at risk for catastrophic second impact syndrome because this condition generally results from two impacts which are closer in time than the two impacts sustained by plaintiff. Further, Dr. Finkel believed that plaintiff's cervical complaints may be due to his muscle bulk or to changes in his neck. Dr. Finkel believed that it would be best for plaintiff to delay heavier training for 5 or 6 weeks to see how he progressed.
17. Plaintiff saw Dr. Tuttle on January 7, 1997. Plaintiff reported that his headaches were "100% better" with the 5 to 6 weeks of rest. Plaintiff stated that he had 10 headaches since Thanksgiving. The last headache was two weeks prior when plaintiff's old high school coach grabbed him by the neck; this headache lasted 10 minutes and was occipital to eyes. Plaintiff also stated that his neck was "80% better" and that he was not taking any medications. Plaintiff was doing light workouts at home. The chart note indicates that plaintiff sustained a 3.85 grade point average in the fall semester with all As with the exception of one B.
18. On January 10, 1997, a cervical MRI was performed. The radiology report reveals that plaintiff's disc height were largely preserved, but that plaintiff had disc bulges, most prominent on left at C6-7 and right at C7-T1. These findings were recorded as multilevel degenerative changes of the mid to lower cervical spine.
19. Dr. Tuttle saw plaintiff on January 13, 1997, after plaintiff was injured when he took a fall on the mat and injured his thumb. Plaintiff reported "no more h/a [headaches]" and that he continued to improve. Plaintiff was advised not to wrestle because of the finger injury. The x-ray report for this injury indicated a small fracture of the first metacarpal.
20. Dr. Finkel next saw plaintiff on January 24, 1997, and reported that plaintiff's headaches were definitely improving. Plaintiff was able to run 40 to 45 minutes without headache and was lifting 90% of his needed capacity. Plaintiff had stopped taking the Indocin that was prescribed for his headaches. In this visit, Dr. Finkel reported that plaintiff's last headache had occurred over Christmas break when an old wrestling coach, while showing a move, grabbed plaintiff's neck. This produced a headache that lasted a few hours. Plaintiff indicated that his current level of training was adequate and wanted to know when he could go back to contact. Dr. Finkel indicated that all concern over catastrophic second injury "can be put to rest" and explained that the nature of the neck injury is best "modeled after whiplash." Dr. Finkel thought that the significant concern was plaintiff's headaches which can occur from vigorous neck movement.
21. Dr. Tuttle saw plaintiff on January 27, 1997, at which time it was noted that plaintiff's thumb was in a fiberglass cast. Dr. Tuttle also noted that Dr. Finkel has sent a letter indicating that there was a "nil risk" of significant second impact syndrome and that plaintiff was cleared to restart activity on mats.
22. In February, 1997, plaintiff was seen for a herpes rash on his body which was associated with contact during wrestling.
23. In November 1997, plaintiff sustained a dislocated ankle and was treated at West Pocono Hospital in Pennsylvania. Plaintiff was seen on November 24, 1997, for ankle complains and demonstrated increased swelling, decreased range of motion, and decreased functional ability to his ankle. Plaintiff was unable to place weight on this foot. The injury occurred during a wrestling match.
24. The February 10, 1998, note in Dr. Tuttle's records indicates that plaintiff sustained a concussion and that plaintiff's mother had contacted the doctor with concern. Dr. Tuttle records that plaintiff said that he was "fine" and was not having any headaches.
25. Records from the student health service for February 20, 1998, indicate that plaintiff sustained a concussion during a wrestling match with a 60 second black out. The record reports that plaintiff had 2 concussions in past 1-1/2 years and was under the care of Dr. Tuttle for post-concussion syndrome. The latest concussion occurred while wrestling when other contestant's body fell on plaintiff and other contestant's head struck plaintiff's head in the frontal area. Plaintiff lost consciousness and was confused. Subsequent examination revealed "no observable neuro deficits."
26. Plaintiff saw Dr. Tuttle on February 23, 1998, at which time he reported that he "feels fine" and has no headaches, dizziness, or photophobia and wanted to return to full activity. This note indicates that plaintiff also sustained a blow to the head in the January 17, 1998, match with Delta State that stunned plaintiff; however there was no loss of consciousness and plaintiff won that match. Physical examination revealed that plaintiff's neck was supple and nontender. Dr. Tuttle's assessment was 3-1/2 days post concussion, asymptomatic.
27. Plaintiff saw Dr. Tuttle on March 4, 1998, where it was again reported that he sustained head injuries on February 19 and January 17, 1998. Plaintiff complained of "lightheaded feeling", but had no headaches or seizures. Plaintiff had gradually increased his activities up to some drilling and one-on-one wrestling. Plaintiff was released to live wrestling with use of head protective gear at all times.
28. On April 29, 1998, plaintiff was diagnosed with hypomania with complaint that he was not tired, was sleeping about 2 hours per night, and was missing some classes. Plaintiff was advised to watch for some personality change.
29. In June 1998, plaintiff followed up with Dr. Finkel for his post concussion symptoms and headaches. Dr. Finkel reports that he saw plaintiff when he was injured during an ACC wrestling match and received a purposeful head butt with near syncope and question of anesthesia. This examination was prompted by a request by Dr. Tuttle because plaintiff was acting "unusual." Dr. Finkel noted that plaintiff recently "fell in love" and the next day won a trip to Panama City, Florida, and through the following weeks went on several trips, including a trip to his new girlfriend's Midwestern location. (It appears that this girlfriend is now plaintiff's wife). Plaintiff's roommate thought that plaintiff was spending a lot of money and complained that plaintiff remained awake at night cleaning the house. Plaintiff indicated that he had a feeling of books falling off the shelf and that he was attempting to put them back, but that the books were falling faster than he could put them back. Plaintiff indicated that his headaches are good except for when he does some heavy lifting and then they only last a minute or two. Dr. Finkel expressed that plaintiff was suffering from complications of head injury which included exercise-induced headache, syncope with repeated head injury, and recent episode of mania. Dr. Finkel did not believe that treatment was necessary because plaintiff's was acting more appropriate at the time of his examination.
30. In the fall of 1998, plaintiff entered medical school at UNC.
31. In November 1998, plaintiff reported 3 episodes of complete loss of bladder control since August while lifting weights in excess of 400 pounds. Plaintiff was advised to avoid all lifting over 50 pounds while diagnostic testing was performed.
32. On December 1, 1998, plaintiff had repeat brain and cervical MRI examinations. The brain examination was done with contrast. The brain examination was again reported as "normal." Degenerative changes were noted in the cervical spine with disc bulges at C6-7 and C7-T11 [sic] and indentation of the thecal space and questionable flattening of the spinal cord. Signal intensity in the spinal cord was normal.
33. On December 15, 1998, plaintiff was again seen by Dr. Finkel, primarily for complaints for urinary incontinence. Plaintiff described voiding while lifting 400 to 450 pounds and that these symptoms did not occur when he lowered his weight to 250 pounds. Plaintiff also described an incident in the summer while wrestling with his girlfriend when he sustained an insignificant bump on the head by a bedside table and lost consciousness for about 30 seconds and became groggy. In addition, on December 3 plaintiff sustained a mild head injury and a loss of consciousness; his girlfriend became concerned and called 911. Plaintiff indicated that he recovered spontaneously. Plaintiff indicated that he had headaches 2 or 3 times per week which would last for a couple of hours. Plaintiff also complained of occasional lightheadedness, but denied nausea, emesis, or photophobia. Physical examination revealed intact mental status and normal motor strength. Dr. Finkel recommended an EEG, lumbar puncture, and radiology studies of the lower spine to determine the cause of the incontinence and syncope.
34. On February 9, 1999, Dr. Finkel performed a lumbar puncture. It was noted that plaintiff had an opening pressure of 25cm. After 14cc of spinal fluid was removed his reading was 20. These findings were on the outer limits of normal; however, Dr. Finkel opined that this may be due to his physique and abdominal tone and his training which may result in a false positive result. Dr. Finkel prescribed Diamox and allowed plaintiff to return to his normal levels of activity.
35. On February 15, 1999, plaintiff was complaining of headache (6 on a scale of 10), stiff neck, photophobia, and arm numbness secondary to lumbar puncture that was performed on February 9, 1999. Plaintiff was noted to appear uncomfortable with occipital throbbing that is worse with standing. Anesthesiology was requested to perform a blood patch to repair the leak from the lumbar puncture.
36. Plaintiff followed up with Dr. Finkel on March 17, 1999. Plaintiff was complaining of headaches after vigorous exercise. Plaintiff was recommended to continue with Diamox for a month and then stop it for a month.
37. Plaintiff was seen by Dr. Finkel on June 7, 1999. Plaintiff was still taking Diamox and complained of exertional headaches which occurred with exercise, vigorous activity, and coitus. Plaintiff expressed that he felt clumsy, but was having no difficulty with his cognitive function. Plaintiff denied syncope or incontinence. Dr. Finkel indicated that he was contacted by plaintiff's lawyer and had written a letter discussing plaintiff's ongoing care and prognosis. This letter is not in the record and Dr. Finkel was not deposed.
38. Plaintiff saw Dr. Finkel on September 23, 1999, stating that his condition had changed. Plaintiff indicated that he took Diamox only before lifting and that he has a mild headache afterwards with some photophobia. Plaintiff was playing volleyball and living an active lifestyle. Plaintiff was concerned about a new headache that he experiences 3 to 4 times per week that tends to be on the right side in occiput or frontal temporal area. The new headaches last 1 to 5 hours and are associated with jaw and neck stiffness. Plaintiff indicated that he only had one episode of unconsciousness which occurred when he hit his head on the wall. Plaintiff is periodically hypomanic. Dr. Finkel expressed that the new headache is probably related to plaintiff's prior headaches and may represent other changes in this life. The headaches may be exacerbated by neck disease which was shown on the MRI. Dr. Finkel indicated that daily therapy was not necessary. Plaintiff was instructed to keep a headache calendar.
39. Plaintiff was seen by Dr. Finkel on December 17, 1999. Plaintiff indicated that he was "doing all right", but expressed that he had a headache 2 weeks prior that lasted for 4 or 5 days (during the period of his medical school exams). Plaintiff was jogging, lifting weights, and playing racquetball. Headaches would occur with these activities. Plaintiff had urinary incontinence while lifting 460 pounds. Dr. Finkel expressed that he had concern about plaintiff's reflexes; however, the results of this testing is not included in his record. Plaintiff was to be examined for "Chiari malformation" compression. This is the final record from Dr. Finkel in evidence; therefore, the results of this testing and neurological evaluation of plaintiff after December 1999 is not established.
40. On December 31, 1999, plaintiff married his girlfriend.
41. On February 2, 2000, Plaintiff had another MRI of the cervical spine for diagnosis of potential herniated disc. The radiology report indicates that plaintiff has some loss of the cervical lordosis (curvature) and some anterior spondylosis (lack of movement) of the vertebrae. Mild disc bulges were noted at C5-6, C6-7, and C7-T1. There was no evidence of nerve compromise or significant narrowing of the spinal canal. Signal intensity in the spinal cord appeared normal. There was no evidence of a herniated disc.
42. On July 14, 2000, plaintiff was seen for apparently unrelated skin and GI problems. At this time it was noted that his post-traumatic headaches were stable.
43. Plaintiff on December 12, 2000 complained of recurring tingling sensation in his hands, bilaterally. No upper extremity weakness was found. Plaintiff's chronic headaches were again reported as stable. Upper extremity paresthesis was created by extension, and was believed to be radiculopathy secondary to cervical spine disease.
44. On February 1, 2001, Gregory H. Tuttle was deposed in this case. Dr. Tuttle is the only medical witness offered by either party. Dr. Tuttle is a physician board certified in family medicine, emergency medicine, and has added qualifications in sports medicine. Dr. Tuttle indicated that plaintiff did not present a history of headaches prior to the July 1996 incident made the basis of this action and that plaintiff has had problems with headaches after this incident. Dr. Tuttle corroborated the medical history of plaintiff, outlined above, with indication that plaintiff had sustained trauma to his head and neck on numerous occasions including in November 1995 (before the incident in question) as well as other subsequent trauma during collegiate wresting and in play with plaintiff's wife (then his girlfriend). Dr. Tuttle expressed that plaintiff suffers from and is currently diagnosed with degenerative arthritis, moderate migraine headaches, and mood disorder including hypomania. Dr. Tuttle first saw plaintiff after the July 1996 incident in September 1996, when plaintiff had indicated that his post-injury headaches had steadily improved until the day before the visit when he had increased headaches while weight lifting. Plaintiff was previously diagnosed with post-concussive syndrome which refers to loss of normal regulation of the brain where there can be increased pressure in the brain and problems with auto-regulation. Dr. Tuttle noted that plaintiff had chronic head and neck pain that appeared to caused by his neck injury, particularly the subluxation (movement) of C5 on C6. Dr. Tuttle, however, did not believe that plaintiff's neck problem was sufficient to warrant immobilization (surgery). Dr. Tuttle expressed that the axial load the plaintiff sustained in July 1996 with the Cybex machine was the most likely single event that caused plaintiff's spinal injury.
45. Dr. Tuttle expressed that the head trauma plaintiff received would increase the risk of highly fatal second impact syndrome. Dr. Tuttle's implication that plaintiff had, or currently suffers from, second impact syndrome is contrary to plaintiff's medical history and his medical records. Concerned with this potential condition, Dr. Tuttle referred plaintiff to Dr. Finkel, a neurologist. On November 19, 1996, and January 24, 1997, Dr. Finkel wrote Dr. Tuttle to advise that concern over second impact syndrome could be put to rest. The Full Commission finds that Dr. Finkel, as a neurologist, would be in a better position than Dr. Tuttle, a family practitioner, to address this issue, and thereby, does not place any weight on the implication that the July 1996 injury includes second impact syndrome.
46. Dr. Tuttle explained that plaintiff was released to continue wrestling after the July 1996 injury because plaintiff's condition had improved.
47. After returning to wrestling plaintiff, sustained subsequent head and neck trauma (including concussions) that occurred in wrestling matches and while playing with his wife (then girlfriend).
48. Dr. Tuttle did not indicate that plaintiff was having any educational or cognitive problems from his various injuries. Plaintiff complained that he had not scored as high as he thought on some exams and had some difficulty with concentration. In a December visit, plaintiff indicated he was having problems with tingling sensations in both hands after two weeks of his surgery rotation. Dr. Tuttle indicated that these sensations could be the result of radiculopathy caused by edema or fluid around the disc, the disc itself, or something causing pressure on the nerve. Dr. Tuttle opined that these problems "could" be related to the initial injury in July 1996. Dr. Tuttle testified that plaintiff continued to suffer from post-concussive syndrome and that he did not know whether this condition would be permanent. On direct examination, Dr. Tuttle testified that the most likely cause of plaintiff's symptoms, his headaches, neck pain, and other problems was the July 1996 injury.
49. On cross-examination, Dr. Tuttle explained that plaintiff's condition are not solely caused by the July 1996 incident. First, plaintiff sustained a concussion in November 1995, where Dr. Tuttle disqualified plaintiff from continuing the match because of his unconsciousness and unsteady appearance. Further, plaintiff complained in April 1996 of cervical-parascapular problems while lifting weights and was having pain with movement of his left arm and with turning his head. Dr. Tuttle did not appear to be aware of the extent of plaintiff's physical activities (including weight lifting and wrestling) after the July 1996 incident; however, his records did note that plaintiff injured his thumb in January 1997 while wrestling. Plaintiff was released to return to wrestling around January 13, 1997, because plaintiff was without headaches and his neck was better. Dr. Tuttle believed that plaintiff's symptoms had resolved sufficiently to allow him to return to wrestling. Because plaintiff's symptoms and headaches had resolved, Dr. Tuttle did not believe that plaintiff's post-concussion syndrome made plaintiff more susceptible to further injury. Dr. Tuttle explained that plaintiff had other traumatic injury to his head and neck after July 1996.
50. On the crucial question of how he determines which of the concussions is most significant in causing plaintiff's current condition, Dr. Tuttle indicated that he looked at the period of time that the symptoms lasted. Dr. Tuttle testified that he believed that the July 1996 injury was the most severe and lasted the longest. When pressed further, however, Dr. Tuttle said that the July 1996 injury "maybe wasn't" the most significant, and finally indicated that he did not know which one to pick. Saliently, Dr. Tuttle's testimony establishes that plaintiff sustained numerous significant episodes of trauma to his head and neck that cumulatively contribute to plaintiff's present condition. Further, plaintiff's weight lifting, wrestling, and other activities would lead to further stress on his body and degenerative changes than would be seen in the average person, but that plaintiff's changes were beyond what he had expected and opined that the axial load from the July 1996 event separates that event from other cumulative trauma on his head and neck. Ultimately, Dr. Tuttle expressed that he does not know how to separate the trauma from weight lifting, wrestling, and other activities from the injury sustained in July 1996.
51. On the specific issue of hypomania, Dr. Tuttle expressed that this condition did not occur until April 1998, after plaintiff had sustained another trauma to his head, and, therefore, it was difficult to attribute that condition to the July 1996 incident.
52. Dr. Tuttle did not indicate that plaintiff's conditions were disabling or otherwise prevented plaintiff from pursuing his educational, professional, or recreational goals. The evidence in the record is that plaintiff successfully completed undergraduate school at UNC, scored above average for acceptance at UNC on the medical entrance examination, was accepted into medical school, and was in the top 25% of his medical school class. At the time of the evidentiary hearing, plaintiff was in his third year of medical school.
53. Plaintiff testified that he lost a year of wrestling eligibility for the `96-97 season when he took the red shirt and that he did not wrestle competitively during his first year of medical school. In addition, he had to forfeit a spot at the national tournament in his senior year, although it is not clear whether this was because of the July 1996 injury or the concussion that he sustained wrestling in the ACC tournament. Plaintiff indicated that he had chronic and continued problems since July 1996, with headaches, hypomania, and problems in his hands and arms.
54. Plaintiff testified that he intended to pursue a career in surgery, but was now intending to pursue a residency in family medicine because he did not believe that he could endure the long surgeries because of the injury to his neck and the resulting radicular problems in his arms and hands. Plaintiff, over objection (later sustained by the Deputy Commissioner), suggested that his cervical condition and resulting radiculopathy was so severe that he would require surgery and could not continue with his dream to be a surgeon. In contrast to plaintiff's testimony, the medical records, Dr. Tuttle's testimony, and plaintiff's medical school records do not supported this potential element of damage. Contrary to plaintiff's assertions, medical records from Dr. Toselli (Neurosurgery), Dr. Almekinders (Orthopedics), and Dr. Finkel (Neurology) clearly indicate that plaintiff's condition did not require surgery or other significant intervention. Further, the plaintiff's academic records for his medical school rotation in surgery (Tr. pp. 000137-000144) reveal that plaintiff was found to be a strong candidate for a career in surgery and his professors recommended that he continue to pursue this career. There is no credible evidence that plaintiff's cumulative condition, let alone that directly associated with his July 1996 injury, would prevent plaintiff from pursuing a career in surgery.
55. Based on the competent medical evidence, the Full Commission finds that plaintiff sustained injuries as a proximate result of the July 1996 incident when the cable came loose from the weights causing plaintiff to pull the bar into his head and placing a load on his head and neck. The precise nature and degree of plaintiff's injury from this injury is difficult to ascertain because plaintiff's activities, particularly the weight lifting and wrestling, caused repetitive trauma to his neck and spine, and plaintiff sustained numerous prior and subsequent episodes of blunt trauma to his head and neck which resulted in concussions and other injury. The greater weight of the credible evidence is that plaintiff sustained a concussion with resulting headaches that gradually improved until January 1997, when plaintiff was found to be headache free and that he was then allowed to resume competitive training. In addition, this incident appears to have caused an aggravation to plaintiff's degenerative disc disease in his neck. The greater weight of the evidence is that the July 1996 incident was the significant causative factor for plaintiff's red shirt from wrestling for the 96-97 season and for the head and neck difficulties that he experienced from July 1996 until January 1997. After January 1997, plaintiff sustained several other injury events, in additional to the continued repetitive trauma to his head and neck from weight lifting and wrestling, such that it can not be said that the July 1996 incident was the sole cause of plaintiff's subsequent problems. Moreover, there is no testimony that plaintiff would not have his current conditions "but for" the July 1996 injury or that his current conditions are "worse" because of the July 1996 injury. The greater weight of the evidence is that the July 1996 injury is an inseparable contributing factor to the repetitious and episodic trauma that plaintiff has sustained to his head and neck. The greater weight of the evidence does not establish that plaintiff sustained the subsequent concussions and other trauma to his head and neck because of the July 1996 injury.
56. The greater weight of the medical evidence does not establish that the diagnosis for hypomania and incontinence is related to Plaintiff's July 1996 injury. Hypomania was diagnosed in 1998 and Dr. Tuttle described that, because of the time period, it was difficult to associate this condition with the July 1996 injury. Further, the medical records reflect that this condition resulted after the plaintiff sustained another concussion while engaged in competitive wrestling. With reference to the incontinence, there is no medical evidence as to the cause of this condition. The records indicate that it is possible that it is from a brain injury; however, the diagnostic testing has been negative for a brain injury. Dr. Finkel's records indicate that the incontinence could be caused by damage to the spine below the cervical region that could be related to pressure on the lower spine from degenerative changes from weight lifting. In 1999, Dr. Finkel recommended MRI and other examinations to determine the cause of this condition, but no further records were presented from Dr. Finkel after this recommendation. The incontinence occurs when plaintiff is lifting weight in the 400 pound range and thereby the greater weight of the evidence is that this symptom is related to that exertional activity. Further, Dr. Tuttle in the report provided to plaintiff's economist did not include incontinence in the conditions that he associated with the July 1996 injury. Moreover, the plaintiff has the burden to prove that the hypomania and/or incontinence are caused by the July 1996 injury and he had failed to produce sufficient evidence to meet this burden.
57. Plaintiff has presented evidence of headaches, neck pain, limitation of activities, and other evidence of pain and suffering and physical impairment and disability caused by his July 1996 injury for the period from July 1996 through January 1997. In addition, plaintiff has presented competent evidence that he started to receive exertional headaches following the July 1996 injury and that this injury is the precipitating factor for the chronic exertional headaches from which he continues to suffer.
58. Plaintiff presented evidence of mental anguish during the period from July 1996 through January 1997 because of his July 1996 injury and his inability to perform to his normal activity level and taking the red shirt in wrestling. Consistent with the finding that plaintiff continues to suffer from exertional headaches from his July 1996 injury, plaintiff has established anguish concerning this condition. Plaintiff also established mental anguish for his inability to wrestle in the 96-97 season.
60. Plaintiff has not presented any evidence concerning past medical expenses incurred as a result of his July 1996 injury. Further, plaintiff has not presented any evidence concerning future medical expenses to be incurred from his July 1996 injury.
61. Plaintiff has not presented any evidence of any permanent impairment rating from his July 1996 injury. Plaintiff established that his injury precluded him from participating in the 96-97 wrestling season.
62. Plaintiff did establish a period of temporary impairment for the period from July 1996 to January 1997 which resulted from the July 1996 injury.
63. Plaintiff presented economic evidence from Gary Robert Albrecht, Ph.D., which primarily fell into two categories: (1) future loss of earnings based on medical diagnosis, and (2) future loss of earning capacity based on plaintiff's contention that he would have to become a family practitioner because his injury precluded him from pursuing his dream to be a surgeon. The evidence, however, does not support damages for the plaintiff because Dr. Albrecht's testimony is based on assumptions which have not been found by the greater weight of the credible evidence. On the first theory of recovery, Dr. Albrecht assumes that plaintiff has the diagnosis of degenerative arthritis, migraine headache, and mood disorder and that each of these diagnosis would diminish plaintiff's future earnings by 10%, or combined by 27.1%. The Full Commission, however, does not find that plaintiff has any permanent diagnosis for these conditions that was significantly caused by the July 1996 injury, that plaintiff would not have sustained these same conditions absent the injury of July 1996, or that these conditions were permanently disabling. Therefore, because Dr. Albrecht's assumption is necessary to this theory of recovery his testimony is not evidence of damage to plaintiff. On the second theory of recovery, Dr. Albrecht assumes that plaintiff would have pursued a career in surgery and is precluded from this career because of the injuries sustained in July 1996. Again, the Full Commission finds that the evidence does not support this assumption, and thereby Dr. Albrecht's testimony is not evidence of damage sustained by plaintiff. The greater weight of the evidence is that plaintiff has failed to establish that he has a future loss of earnings because of the injury that he sustained in July 1996.
63. Plaintiff presented no evidence of a past loss of wages.
64. Although in most tort cases it is important to look at evidence of what is taken away in order to determine the nature and extent of the plaintiff's injury, to place the injury in proper perspective it is also often necessary to also look at what was left behind. In applying that analysis to this case, the Full Commission finds that plaintiff was able to successfully return to competitive collegiate wrestling, including a bid to the ACC tournament and to the national tournament, after he was released to competitive training in January 1997. Further, plaintiff obtained a 3.85 grade point average for the Fall 1996 semester and a 29 on his MCAT. Plaintiff graduated from college, on time, and was accepted in medical school. There is no evidence of lack of performance by plaintiff in undergraduate or medical school. Plaintiff, by his own testimony, is in the top 25% of his medical school class and will pursue graduate medical training. His performance scores for his surgery rotation were exceptional and he was encouraged to pursue this career. In addition, plaintiff was able to carry on a social life, married the "prettiest girl in school," and is a physically and mentally strong achiever with a bright future. Fortunately, the evidence does not establish that the July 1996 injury has taken much away.
65. Based on the evidence of injury from the July 1996 incident, as found above by the Full Commission, plaintiff has sustained damages in the amount of Fifty Thousand Dollars ($50,000.00) for his physical pain, mental anguish, impairment, and other damage.
 ***********
Based on the foregoing, the Full Commission enters the following
 CONCLUSIONS OF LAW
1. The North Carolina Industrial Commission has subject matter and personal jurisdiction over this action and the parties.
2. No default judgment can be entered against the State of North Carolina or a State agency without evidence to support the plaintiff's claim. Rule 55(f), Rules of Civil Procedure. In the instant case, plaintiff by his testimony established that while he was using a Cybex machine at the University of North Carolina the cable connecting the pull bar to the weights came loose causing plaintiff to pull the bar into his head. This evidence corroborates the stipulation of the parties, made pursuant to the discovery sanction, that the injury occurred because the Cybex machine was negligently maintained by defendants. Although further information may make the finding of negligence stronger, plaintiff was precluded from obtaining information concerning the maintenance of the Cybex machine due to defendant's failure to properly answer duly tendered discovery toward this issue. Further, defendants neither offered nor tendered evidence to suggest an absence of negligence. Therefore, based on the greater weight of the evidence before the Full Commission, it is hereby found that plaintiff has established that his injury occurred as the result of the negligence of defendant by and through its duly authorized agent, Laurin Mangili, and that there is no evidence of negligence by plaintiff. N.C.G.S. § 143-291.
3. The greater weight of the competent evidence does not support a claim for loss of wage earning capacity. Although the Commission has approved the use of Daubert principles in determining the competency of expert testimony, these principles do not apply to economic projections which by their nature consist of educated speculation. See Curry v.Baker, 130 N.C. App. 182, 502 S.E.2d 667, disc. review denied,349 N.C. 355, 517 S.E.2d 890 (1998); Horne v. Roadway Package Systems,129 N.C. App. 242, 497 S.E.2d 436 (1998). Rather, in reviewing economic testimony, it is important to review the medical and other information which forms the foundation for the economist's projections. Having determined that the greater weight of the competent evidence is contrary to assumptions necessary to Dr. Albrecht's opinion, the Full Commission concludes that the plaintiff has not established his claim for future loss of wage earning capacity. See Horne v. Roadway Package Systems,supra (economic expert opinion can be excluded when it is based on facts which are unsupported or contradicted by the evidence).
4. Plaintiff is entitled to recover damages for his injuries, including compensation for physical pain and suffering, mental anguish, and physical impairment. N.C.G.S. § 143-291.
5. Defendant shall pay all costs. N.C.G.S. § 143-291.2.
 ***********
The foregoing stipulations, findings of fact, and conclusions of law engender the following
 AWARD
1. Plaintiff have and recover from defendants, and defendants shall pay plaintiff the sum of Fifty Thousand Dollars ($50,000.00).
2. Defendant shall pay the costs of this action including prejudgment interest at the legal rate since June 30, 1999, and post judgment interest from the date of this Award at the legal rate.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER